FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | No. 15-cr-00394 (WHW) |
| | : | |
| FELIX RESTITULLO, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**Walls, Senior District Judge**

      Defendant Felix Restitullo ("Restitullo") has been indicted on one count of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2, and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(5)(B) and 2. Restitullo now moves to suppress statements and evidence on the basis that they were obtained from him in violation of the Fourth and Fifth Amendments of the United States Constitution. This Court held a hearing on August 23, 2016. Defendant's motion is granted as to the statements he made to detectives on March 13, 2014 and denied as to the evidence obtained from the search of his residence.

### FACTUAL AND PROCEDURAL BACKGROUND

      Unless otherwise noted, the Court finds the following facts, based upon the court records and evidence submitted on this motion. Conflicts in the evidence are noted and resolved based upon the Court's evaluation of credibility.

FOR PUBLICATION

## I.     The investigation

According to the criminal complaint filed in this Court on July 23, 2015, ECF No. 1,

Defendant Felix Restitullo lived in Jersey City, New Jersey with his mother, Maria Restitullo, on

March 13, 2014. *Id*. at 3; *see also* Aff. Maria Lucilla Restitullo, ECF No. 16-3 ¶ 7. Maria

Restitullo acted as caregiver to minor children in her home, including "a minor child who is a

member of Restitullo's family" ("Victim 1"), identified by Defendant as his niece. ECF No. 1 at

3; Pl's Br. Supp. Mot. Suppress, ECF No. 16-1 at 3. Restitullo had previously been convicted in

the Hudson County Superior Court of possession of child pornography. ECF No. 1 at 3.

In March 2014, after receiving reports that a seven-year-old girl ("Victim 2") had told

friends at school that her "uncle" was having "S-E-X" with her, law enforcement officers with

the Hudson County Prosecutor's Office, Special Victims Unit ("SVU") conducted an interview

with Victim 2. March 13, 2014 Supp. Report Det. Joanne Son, Decl. Melissa Wagenheim in

Supp. Opp. Def. Mot. Suppress ("Wagenheim Decl."), ECF No. 23-1 Ex. A, at 1. Victim 2

identified the "uncle" as "Felix," the son of her babysitter, and told officers that she had also

seen "Felix" touch her friend, Victim 1. *Id*. On March 13, 2014, SVU law enforcement officers

conducted an interview with Victim 1, who told them that Restitullo had engaged in sexual acts

with her on multiple occasions and had taken photos of her with a silver camera. *Id*. at 1–2; ECF

No. 1 at 3. Shortly after the interview ended, officers obtained a warrant for Restitullo's arrest.

ECF No. 23 at 7; *see also* Arrest Report, ECF No. 23-1 Ex. E.

## II.    Restitullo's interviews and allegedly coerced *Miranda* waiver

### a.   Initial interview and invocation of *Miranda* rights

On March 13, 2014, Restitullo was arrested at his place of employment in Lyndhurst,

New Jersey by the Hudson County Prosecutor's Office for charges that included aggravated

FOR PUBLICATION

sexual assault and endangering the welfare of Victim 1. ECF No. 23-1 Ex. E. Restitullo was

taken to the SVU headquarters in Jersey City, New Jersey. Mot. Suppress Hr'g Tr. (Hr'g Tr.)

122:18–24; ECF No. 16-1 at 3. At approximately 9:50 pm, in an interview room at the SVU

headquarters, Restitullo was interviewed by Detective Joanne Son of the SVU. Hr'g Tr. 39:19–

21; *see also* ECF No. 16-1 at 3; March 14, 2014 Supp. Report Det. Joanne Son, Wagenheim

Decl., ECF No. 23-1 Ex. B, at 3. The Government has submitted a video recording of the

interview. Hr'g Ex. 4-1, 4-2. Detective Son read Restitullo his *Miranda* rights, and Restitullo

signed a *Miranda* waiver form. *Id.*; ECF No. 23-1 Ex. B, at 3. As Detective Son began preparing

a form granting the SVU consent to search Restitullo's dwelling, Restitullo said he did not want

to speak or sign forms and invoked his right to counsel. Hr'g Ex. 4-2; ECF No. 23-1 Ex. B, at 3;

*see also* Aff. Felix Restitullo, ECF No. 16-2 ¶ 6. Detective Son stopped the interview and

escorted Restitullo out of the room and into a hallway toward a holding cell. Hr'g Ex. 4-2; ECF

No. 23-1 Ex. B, at 3; ECF No. 16-2 ¶ 7.

### b. The hallway exchange

The parties dispute what happened next and video surveillance is not available. Restitullo

claims that, in the hallway outside the interview room, Detective Son told him that "last time you

confessed without a lawyer," and that another officer, Sergeant Peter DeCarlo, approached him,

stood "about an inch" from his face, and began "screaming" and "yelling" at him. ECF No. 16-2

¶¶ 7–9. Sargent DeCarlo allegedly told Restitullo, "You know exactly what is going on here.

You need to drop the act and get back in there and give a statement because if you really cared

about your niece and wanted to know what happened to her you would tell the truth. If you don't

tell the truth we're going to arrest your mother." ECF No. 16-2 ¶ 8. Restitullo then agreed to

waive his *Miranda* rights and consent to the search of his home. He was escorted back into the interview room by Detective Son. ECF No. 16-2 ¶¶ 10–11.

The Government claims that Restitullo, not Detective Son or Sargent DeCarlo, initiated conversation on the hallway walk. Opp. Mot. Suppress, ECF No. 23 at 12. According to the Government, Restitullo asked the officers if Victim 1 was okay, and Sargent DeCarlo replied, "in sum and substance," that if Defendant really cared about his niece and wanted to know if she was okay, he would speak with the officers. *Id*. At this point, Restitullo agreed to waive his *Miranda* rights and was escorted back to the interview room by Detective Son. *Id*. at 9–10; ECF No. 23-1 Ex. B, at 3.

At the suppression hearing, Detective Son, Sargent DeCarlo, and Defendant Felix Restitullo each testified about the events that took place over the approximately three-minute period that the group was in the hallway outside the interview room. Detective Son testified that she and Sargent DeCarlo began to escort Mr. Restitullo back to the holding cell. Hr'g Tr. 46:18– 47:6. When questioned about the specifics of the hallway exchange, Detective Son was unable to provide any details about what happened, who spoke first, or what was said, testifying only: "I don't remember the specific conversation that happened in the hallway" and "I don't recall him speaking with Sargent DeCarlo." *Id.* at 48:20–22, 50:11–12. She also failed to recall how she knew Restitullo had changed his mind and was interested in making a statement. *Id.* at 51:7–16.

Sargent DeCarlo testified that he was observing Detective Son's initial interview with Restitullo until Restitullo invoked his *Miranda* rights and the interview ceased.  Hr'g Tr. 101:14– 102:3. At that point, he joined Detective Son to assist in escorting Restitullo back to the holding cell. *Id.* at 102:16–18. According to Sargent DeCarlo, Restitullo then made a statement along the lines of "he hopes his niece is okay and he wants his niece to be all right." *Id.* at 103:13–16.

FOR PUBLICATION

Sargent DeCarlo testified that he responded to Defendant's statement by saying: "you should just be honest," which prompted Restitullo to change his mind regarding his *Miranda* rights. *Id.* at 103:17–104:1.

Restitullo testified that, upon leaving the interview room, Detective Son immediately engaged him in conversation by commenting that he confessed without talking to a lawyer the last time he was arrested. *Id.* at 127:13–128:7. Then, Sargent DeCarlo approached Restitullo from behind and aggressively pointed his finger at him, saying: "you know exactly what this is about. If you really were concerned about your niece, you would get back in there and make a statement or we could also bring your mother in." Hr'g Tr. 128:1–7. Restitullo stated that, as a result of Sargent DeCarlo's unsolicited statement, he agreed to return to the interview room and sign various *Miranda* waivers. Hr'g Tr. 134:17–20.

### c.  Second interview and *Miranda* waiver

The United States has submitted a video recording of Detective Son's second interview with Restitullo. Hr'g Ex. 4-3. This video, taken immediately after the exchange in the hallway, provides a brief contemporaneous account as to what occurred during the three unrecorded minutes. Detective Son explicitly asks Restitullo why he changed his mind and decided to return to the interview room only a few minutes after invoking his *Miranda* rights. Hr'g Ex. 4-3. Restitullo's response, which the Court relies on to determine the credibility of each witness's recollection of the hallway exchange, *see* infra Discussion I.B.1, makes clear that he agreed to return to the interview room because of "the one statement he [Sargent DeCarlo] made that if I wanted, if I really care about my niece and find out what's going on then I'll talk to you guys." Hr'g Ex. 4-3. Detective Son also asked Restitullo if anyone had threatened him or made promises to him to convince him to speak, and he replied "No" to both questions. *Id.* Restitullo

FOR PUBLICATION

did not mention that Sargent DeCarlo had allegedly threatened to have his mother arrested, but he did ask if his mother was okay. *Id.* at 4-3, 4-4.

At approximately 10:12 pm, Restitullo signed documents consenting to the search of his home. ECF No. 16 at 4; ECF No. 23 at 16. After signing the form, Defendant spoke with Detective Son and Sergeant Chonda Rosario of the SVU for approximately three hours, making several inculpatory statements. ECF No. 16-1 at 4; ECF No. 23 at 17–18.

## III.   The allegedly unlawful search

According to the Government, law enforcement officers spoke with Maria Restitullo at the SVU headquarters on the afternoon of March 13, 2014, before Felix Restitullo was arrested. ECF No. 23 at 7; ECF No. 23-1 Ex. B, at 2. According to Ms. Restitullo, the officers threatened to "break down the door" of her home if she did not give them her house key. ECF NO. 16-3 ¶ 5. After accompanying Ms. Restitullo to retrieve a key to her home, law enforcement officers, including Detective Son, accompanied her to her home to search for Felix Restitullo. ECF No. 23 at 8; ECF No. 23-1 Ex. B, at 2.

According to the United States, Ms. Restitullo gave consent for the officers to enter and search the home for Defendant. Hr'g Tr. 80:9–11; ECF No. 23 at 8. Ms. Restitullo denies that she gave the officers permission to search her home or the Defendant's bedroom. ECF No. 16-3 ¶¶ 14–15. The officers entered the apartment but did not find the Defendant. ECF No. 23-1 Ex. B, at 2. Ms. Restitullo states that she informed the officers that Defendant was at work, but that the officers insisted that she was lying, that the Defendant was "hiding," and that Ms. Restitullo "would be in trouble" if she did not "tell them the truth." ECF No. 16-3 ¶ 10. After searching the apartment for the Defendant, several officers drove Ms. Restitullo back to the SVU. Hr'g Tr. 81:5–9; ECF No. 23-1 Ex. B, at 2. Two officers, Detectives S. O'Leary and L. Nelson, were

FOR PUBLICATION

instructed to remain at the home and "secure the location" until a search warrant was obtained. *Id*. Detective Son and Sargent DeCarlo both testified that nothing was seized or taken from the residence and none of the rooms were searched for evidence at that time. Hr'g Tr. 27:16–25; 93:2–10. While Sargent DeCarlo attempted to locate Restitullo at his workplace, Detective Son returned to the SVU where she drafted an affidavit and search warrant for Restitullo's home and bedroom. *Id.* at 30:3–7; Hr'g Ex. 2. The interviews Detective Son had previously conducted with the two minor victims provided the sole basis for the draft affidavit. *Id.* This search warrant was never sworn or executed because Restitullo signed a consent form authorizing a search of the home shortly after arriving at the station.

Later on the night of March 13, 2016, law enforcement officers executed a search of Restitullo's bedroom based on his signed consent form. ECF No. 16-1 at 4. They obtained computers, electronic storage media, and a silver Minolta camera, Model DiMAGE S404 (the "camera"), all allegedly belonging to Restitullo. ECF No. 1 at 3–4. Law enforcement officers applied for and received a warrant to search the seized items. ECF No. 16-1 at 4. Examination of the electronic media allegedly revealed over 1,500 images and over 200 videos of child pornography, including "images of prepubescent children being sexually abused, and material that portrays sadistic or masochistic conduct or other depictions of violence." ECF No. 1 at 3–4. Thirteen of the images allegedly appeared to be images of Victim 1 (the "production images"). *Id*. at 2–3. The forensic examination of the electronic media also allegedly revealed that the production images were created using a Minolta DiMAGE S404 camera, the same brand and model as the camera seized from Restitullo's bedroom. *Id*. at 3.

FOR PUBLICATION

## IV.    The complaint and indictment

On July 23, 2015, a complaint was filed in this Court charging Restitullo with one count

of sexual exploitation of children, in violation of 18 U.S.C. §§ 2251(a) and (2), and one count of

possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (2). ECF No.

1 at 2–3. On August 10, 2015, a grand jury returned an indictment charging Restitullo with the

same two counts. ECF No. 7. Restitullo was arraigned on August 26, 2015. *See* Minute Entry for

Proceedings held on August 26, 2015, ECF No. 8.

## V.    Restitullo's motion to suppress

On March 16, 2016, Restitullo filed a motion to suppress statements and evidence

gathered in violation of the Fourth and Fifth Amendments to the United States Constitution. ECF

No. 16. Restitullo argues that he signed the consent to search his home and spoke with law

enforcement officers after initially requesting counsel only because an officer, Sargent DeCarlo,

threatened to arrest his mother if he did not cooperate, *id*. at 5, and that officers unlawfully began

searching his home without receiving consent from him or his mother. *Id*. at 5–6.

## LEGAL STANDARD

A criminal defendant brings motions to suppress evidence under Federal Rule of

Criminal Procedure 12(b)(3)(C). A defendant may move to suppress evidence obtained in

violation of the Fifth Amendment to the United States Constitution's privilege against self-

incrimination. U.S. Const. amend V; *see also United States v. Crook*, 502 F.2d 1378, 1381 (3d

Cir. 1974). In *Miranda v. Arizona*, the Supreme Court held that, in order to "permit a full

opportunity to exercise the privilege against self-incrimination, the accused must be adequately

and effectively apprised of his rights," including his rights to remain silent and to have counsel

present if he so desires. 384 U.S. 436, 467 (1966). A defendant may waive these rights by

FOR PUBLICATION

making a "deliberate choice to relinquish the protection those rights afford," *United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012), but the prosecution bears the burden of showing a knowing waiver of Fifth Amendment rights on a motion to suppress. *Crook*, 502 F.2d at 1381.

A defendant may also move to suppress evidence obtained in violation of his rights under the Fourth Amendment to the United States Constitution under the "exclusionary rule." *United States v. Leon*, 468 U.S. 897, 906 (1984). The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Law enforcement officers generally must obtain a warrant before searching or seizing a person or his property for the search or seizure to be considered "reasonable." *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). "The burden of proof is on the defendant who seeks to suppress evidence" *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (quoting *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (internal quotation marks omitted)). If the proponent of a motion to suppress can establish a valid basis for the motion, the government bears the burden of showing that the search or seizure fit within one of the established exceptions to the general warrant requirement, or that a warrant was otherwise not required. *Herrold*, 962 F.2d at 1137.

## DISCUSSION

Restitullo makes two arguments for the suppression of evidence in this case. He claims that the statements he made during his second interview with SVU officers on March 13, 2014 should be suppressed because they were obtained in violation of his Fifth Amendment right against self-incrimination. ECF No. 16 at 6–8. Second, he claims that the evidence seized from his home should be suppressed because it was obtained in violation of his Fifth and Fourth Amendment rights. *Id*. 9–11.

FOR PUBLICATION

## I.   The Court will suppress Restitullo's statements.

Restitullo claims that the statements he made during his second interview must be suppressed because they were obtained in violation of the safeguards of *Miranda* and *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), which prevent law enforcement officers from interrogating a defendant who has already invoked his right to counsel. The Court agrees and grants Restitullo's motion to suppress the statements he made to Detective Son after his invocation of counsel.

### A.  Applicable law

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To protect that right, the Supreme Court in *Miranda v. Arizona* ruled that police may not conduct a custodial interrogation without first administering the now-familiar *Miranda* warnings, which include the right to remain silent and the right to the presence of an attorney." *United States v. Fautz*, 812 F. Supp. 2d 570, 616 (D.N.J. 2011) (citing *Miranda*, 384 U.S. at 479; *Dickerson v. United States*, 530 U.S. 428, 443–44 (2000) (revisiting and reaffirming *Miranda*)).

Generally, "if a suspect is not so warned, and does not thereafter make a knowing and voluntary waiver of those rights, the prosecution is barred from using statements obtained during [a custodial] interrogation to establish its case in chief." *Fautz*, 812 F. Supp. 2d at 616 (citing *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)). The *Miranda* rule applies to the admissibility of both inculpatory and exculpatory statements. *Miranda*, 384 U.S. at 444.

After *Miranda* warnings are given, "if the suspect indicates that he wishes to remain silent, the interrogation must cease." *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (citing

10

FOR PUBLICATION

*Miranda*, 384 U.S. at 473–74). "Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.*

"Critically, however, a suspect can waive these rights." *Id.* "To establish a valid waiver," the prosecution must ordinarily "show that the waiver was knowing, intelligent, and voluntary under the 'high standar[d] of proof for the waiver of constitutional rights'" set forth in *Johnson v. Zerbst*, 304 U.S. 458 (1938). *Shatzer*, 559 U.S. at 104 (quoting *Miranda*, 384 U.S. at 475). The court considers "whether a defendant's will was overborne," by looking at the "totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal quotation marks omitted)). These circumstances include the "crucial element of police coercion," as well as the "length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (internal citations omitted). Cases in which "a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare," *Dickerson*, 530 U.S. at 444 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)), and an "express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of the waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

In *Edwards v. Arizona*, the Supreme Court added a "second layer of prophylaxis," *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991), for suspects in custody who initially request counsel but later waive their right and speak to law enforcement officers without counsel present:

> [W]hen an accused has invoked his right to have counsel present during custodial investigation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . . [He] is not subject to further interrogation by the

FOR PUBLICATION

> authorities until counsel has been made available to him, unless the accused himself
> initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484–85. "Under this rule, a voluntary *Miranda* waiver is sufficient at the

time of an initial attempted interrogation to protect a suspect's right to have counsel present, but

it is not sufficient at the time of subsequent attempts if the suspect initially requested the

presence of counsel" because "subsequent requests for interrogation pose a significantly greater

risk of coercion." *Shatzer*, 559 U.S. at 105. The *Edwards* rule is a "bright-line, prophylactic" rule

that "serves the purpose of providing clear and unequivocal guidelines to the law enforcement

profession." *Arizona v. Roberson*, 486 U.S. 675, 682 (1988) (internal quotation marks omitted).

The Third Circuit has adopted the two-part test created by a Supreme Court plurality in

*Oregon v. Bradshaw*, 462 U.S. 1039 (1983), to determine the voluntariness of statements made

by suspects who invoke their right to counsel but later initiate conversation with law enforcement

officers. *United States v. Velasquez*, 885 F.2d 1076, 1084–87 (3d Cir. 1989) (citing *Bradshaw*,

462 U.S. 1044–46). First, the court looks to whether the suspect initiated a conversation

"evincing a willingness and a desire for a generalized discussion about the investigation." *Id.*

(quoting *Bradshaw*, 462 U.S. at 1046) (alterations omitted). Second, because "the initiation of a

conversation by defendant does not by itself constitute a waiver of previously invoked *Miranda*

rights," *Id.* (citing *Bradshaw*, 462 U.S. at 1044), the court adopts the "totality of the

circumstances" test to determine whether the waiver was "made voluntarily, knowingly, and

intelligently." *Id.* (quoting *Bradshaw*, 462 U.S. at 1046; *Miranda*, 384 U.S. at 444). Importantly,

the government bears the burden, by a preponderance of the evidence,[1] of showing both that the

---

[1] "Whenever the State bears the burden of proof in a motion to suppress a statement that the
defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver
. . . by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (citing

FOR PUBLICATION

defendant "initiate[d] . . . further communication, exchanges, or conversations with the police"

and that subsequent events indicate that the defendant waived his Fifth Amendment rights.

*Bradshaw*, 462 U.S. at 1044 (quoting *Edwards* 451 U.S. at 485).

### B. Analysis

Restitullo argues that the statements he made to Detectives Son and Rosario must be

suppressed because he was unlawfully coerced into waiving his Fifth Amendment rights "as a

result of what Sargent DeCarlo said to him," including Sargent DeCarlo's alleged "threat to

arrest his mother" and the "menacing" way in which Sargent DeCarlo allegedly invaded

Defendant's personal space. ECF No. 16 at 8.

### 1. *Bradshaw* step one: Restitullo did not initiate conversation after invoking his right to counsel.

It is not disputed that Restitullo was in "custody" for the purposes of the Fifth

Amendment and *Miranda* when he was arrested and taken to the Hudson County SVU

Headquarters on March 13, 2014. *See* ECF No. 16 at 3. It is also not disputed that Detective Son

read Restitullo his *Miranda* rights during his first interview, and that Restitullo declined to

answer questions and asked to speak with a lawyer. *See id.*; ECF No. 23-1 Ex. B, at 3. Because

Restitullo was in custody, was advised of his right to counsel, and invoked his right to counsel,

*Edwards* provides that he was "not subject to further interrogation by the authorities until

counsel [was] made available to him, unless [Restitullo] himself initiate[d] further

communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85.

---

*Nix v. Williams,* 467 U.S. 431, 444 & n.5 (1984); *United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974)).

FOR PUBLICATION

The parties also do not dispute that Sargent DeCarlo said *something* to Restitullo that led

him change his mind and waive his right to counsel. *See* ECF No. 16-2 at ¶ 8, 13; ECF No. 23-1

Ex. B, at 12, 13. The relevant question is whether, as Restitullo claims, Sargent DeCarlo initiated

the conversation in the hallway, *see* ECF No. 16-2 at ¶ 8, or whether, as the United States claims,

Restitullo initiated the conversation, ECF No. 23 at 12. If the Court finds that the former

occurred, Restitullo's waiver was invalid under the *Edwards* bright-line rule and the statements

must be suppressed. If the Government can prove the latter by a preponderance of the evidence,

Restitullo's waiver was not necessarily invalid. *See Bradshaw*, 462 U.S. at 1045–46 (Defendant

who asked "Well, what is going to happen to me now?" after invoking right to counsel initiated

conversation for purposes of *Edwards* because the question "evinced a willingness and a desire

for a generalized discussion about the investigation; it was not merely a necessary inquiry arising

out of the incidents of the custodial relationship"); *Velasquez*, 885 F.2d at 1086 (Defendant

initiated conversation by asking officer "What is going to happen?").

The Court finds that the Government has failed to show by a preponderance of the

evidence that Restitullo initiated conversation with either Detective Son or Sargent DeCarlo in

the hallway outside of the interview room. Detective Son provided no testimony of material

importance concerning the events that occurred during the hallway exchange because, as noted,

according to her, she has absolutely no memory of the exchange between Sargent DeCarlo and

Restitullo or the circumstances under which Restitullo decided to waive his *Miranda* rights

moments after invoking them. Hr'g Tr. 48:20–22, 50:11–12, 51:7–16. Sargent DeCarlo provided

direct testimony of the exchange, but this testimony lacks credibility because his testimony is

directly contradicted by Restitullo's contemporaneous recollection of what occurred. *Compare*

103:17–104:1 *with* Hr'g Ex. 4-3. Sargent DeCarlo also clearly attempted to deemphasize his

FOR PUBLICATION

statement to Defendant in an attempt to mitigate his actions. *Id.* While the Court questions the veracity of Sargent DeCarlo's testimony about the hallway exchange, there is no reason to doubt the credibility of Restitullo's utterance. Restitullo made the statement immediately upon reentering the interview room and had no reason to be dishonest in response to Detective Son's question about why he decided to speak with her.  It follows that the Government has provided an insufficient basis to conclude that Restitullo initiated the hallway conversation. Finding that the United States has failed to show by a preponderance of the evidence that Restitullo initiated conversation with Detective Son or Sergeant DeCarlo, our analysis need not proceed to *Bradshaw* step two to determine whether his waiver was knowing, intelligent, and voluntary.

The Court finds that officers violated Restitullo's Fifth Amendment right against self-incrimination by imploring him to give testimony against himself immediately after he requested counsel. The statements made during the second March 13, 2014 interview are suppressed.

**II.     The Court will not suppress the evidence seized from Restitullo's home.**

The Government argues that even if the Court finds an *Edwards* violation occurred, evidence from the March 13, 2014 search of Restitullo's residence must not be suppressed. ECF No. 27 at 6–7. Because the Court agrees that the United States has met its burden under the inevitable discovery doctrine, the Court will not suppress the evidence seized from Defendant's home.

**A.  Applicable Law**

Although the Third Circuit has not addressed a case such as this one, where a claim of inevitable discovery is based on the expected issuance of a warrant, the Third Circuit articulated the inevitable discovery standard and laid out the analytical path district courts must follow in *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011).

FOR PUBLICATION

> Under the inevitable discovery doctrine, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (quoting *Nix v. Williams*, 467 U.S. 431, 432 (1984)). The Government can meet its burden by establishing "that the police, following routine procedures, would inevitably have uncovered the evidence." *Vasquez De Reyes*, 149 F.3d at 195. The inevitable discovery analysis focuses on "historical facts capable of ready verification, not speculation." *Id.*; *see Nix*, 467 U.S. at 444 n.5.

*Id.* As the Third Circuit has previously recognized, the inevitable discovery doctrine "permits the court to balance the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding against society's interest in deterring unlawful police conduct." *United States v. De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998).

### B. Analysis

The Government claims that the inevitable discovery doctrine should be applied to the evidence found in the unlawful March 13, 2014 consent search of Restitullo's home because Detective Son had independent probable cause for the search based on the interviews she conducted with the two minor victims, and because she began the warrant process—only abandoning it when Mr. Restitullo signed a search consent form., *see* Hr'g Tr. 18:18–20:9, 30:3–7; Hr'g Ex. 2; ECF No. 23 at 8–9; ECF No. 23-1 Ex. B, at 2. The Government asks this Court to accept that in the natural course of events, the same evidence would have been obtained by lawful measures.  ECF No. 27 at 6–7.

As previously mentioned, the Third Circuit has not addressed a case where the claim of inevitable discovery relied on the expected issuance of a warrant that was never actually sought. In *Stabile*, the Third Circuit applied the inevitable discovery doctrine to evidence uncovered during two searches of lawfully-recovered computer hard drives made under defective warrants. 633 F.3d at 245–46. In deciding not to suppress the evidence, the court emphasized that there

16

FOR PUBLICATION

was little deterrence benefit to suppressing the evidence because the government had "attempted to secure state and federal search warrants at every step of the search." *Id.* at 246.

While at least one circuit has taken the position that proof of inevitable discovery is satisfied if the Government can prove by a preponderance of the evidence that the police would have inevitably sought a search warrant and a neutral magistrate would have granted it (*see United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990), many circuits recognize that there is a manifest difference between good faith efforts to comply with the Fourth Amendment's warrant requirement and situations where police fail to pursue a warrant and later seek the admission of evidence based on claims of probable cause. *See, e.g.*, *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998) ("The existence of probable cause for a warrant, in and of itself and without any evidence that the police would have acted to obtain a warrant, does not trigger the inevitable discovery doctrine any more than probable cause, in and of itself, renders a warrantless search valid."); *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir. 2000) (The Ninth Circuit "has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant." (internal citations and quotation marks omitted)); *United States v. Johnson*, 22 F.3d 674, 683 (6th Cir. 1994) ("To hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause.").

The Court is sensitive to the issues raised by these cases and notes special concern for the potential that the Government's post-hoc claims to the existence of probable cause absent evidence of corresponding police efforts to obtain valid search warrants erode the Fourth Amendment's warrant requirement. But the facts of *Allen*, *Reilly*, and *Johnson* are

FOR PUBLICATION

distinguishable from the present. The *Allen* defendant was arrested for marijuana found in his backpack during a consent search performed by police on a bus. 159 F.3d at 834. After finding the marijuana, police searched another of the defendant's bags without consent or a search warrant, uncovering crack cocaine. *Id.* at 835. The Fourth Circuit held that inevitable discovery could not validate the search because no search warrant had been pursued, no probable cause existed to search the second bag at the time, and an officer's testimony that she would have used a drug sniffing dog to establish the necessary probable cause was too attenuated an argument to obviate the need to meet the warrant requirement. *Id.* at 842–43.

In *Reilly*, federal agents detained bank robbery and car-jacking suspects under exigent circumstances. 224 F.3d at 989. After those circumstances dissipated and Reilly had requested a lawyer, the agents continued engaging him, eventually receiving his consent to search the room where he was staying. *Id.* at 990. The Ninth Circuit refused to allow the evidence collected during the search under the inevitable discovery doctrine, holding that the doctrine cannot apply when the police have probable cause but simply do not attempt to obtain a warrant. *Id.* at 995. The court noted its concern that "nothing outside that which occurred during the improper search supports the discovery of the challenged evidence." *Id.* (citing *United States v. Boatwright*, 822 F.2d 862, 864–65 (9th Cir. 1987) ("[T]he doctrine requires that the fact or likelihood that makes the discover inevitable arise from circumstances other than those disclosed by the illegal search itself.").

Finally, in *Johnson*, police entered a home under exigent circumstances to free a kidnapping victim. 22 F.3d at 676. Once officers had freed the victim, they searched the suspect's bedroom closet, uncovering his guns. *Id.* The closet search was made without any attempt to obtain the suspect's consent or a search warrant. *Id.* The Sixth Circuit held that the

18

FOR PUBLICATION

inevitable discovery doctrine did not apply even though a warrant could have been obtained "since there was no other independent line of investigation or compelling facts illustrating that the guns would have inevitably been discovered." *Id.* at 684.

This case is different for three important reasons: first, Detective Son drafted a warrant application and accompanying affidavit before even speaking with the Defendant. Hr'g Tr. 30:3–7; Hr'g Ex. 2. Second, before the illegal search took place, there existed overwhelming probable cause, established by previously conducted victim interviews, in support of the warrant application. *Id.* Finally, police officers had secured Restitullo's residence, eliminating the possibility that evidence would be removed. Hr'g Tr. 81:5–9; ECF No. 23-1 Ex. B, at 2.

Instead, this case is analogous to other cases where independent investigations established probable cause to support a search warrant and, before the illegal search, steps had been taken to pursue a warrant. In *United States v. Ford*, 22 F.3d 374 (1st Cir 1994), the First Circuit declined to suppress evidence under the inevitable discovery doctrine when police officers did an illegal sweep of a drug dealer's home in the process of arresting him. *Id.* at 375–79 (finding it "beyond argument" that the police had independent probable cause to search the defendant's home based on him returning from the post office with a package full of narcotics, and that they had already made the decision to pursue a warrant before the illegal search).

In *United States v. Whitehorn*, 829 F.2d 1225 (2d Cir. 1987), the Second Circuit affirmed the admission of evidence obtained during an illegal search under the inevitable discovery doctrine when FBI agents had begun the process of obtaining a warrant over an hour before the illegal search, there was "overwhelming" probable cause to support the warrant application, and a warrant was actually issued six hours later. *Id.* at 1228–31; *see also United States v. Moldofsky*, No. 00-Cr-388(RPP), 2000 WL 1818564, at *19–20 (S.D.N.Y. Dec. 12, 2000) (applying

inevitable discovery because a search warrant affidavit completed prior to the illegal search
offered sufficient probable cause and there was no showing that the evidence would not have
been recovered in a later search). *But see United States v. Cabassa*, 62 F.3d 470, 472 (2d Cir.
1995) (declining to apply the inevitable discovery doctrine when there existed a "residual
possibility that a magistrate judge would have required a stronger showing of probable cause"
and the Government could not establish by a preponderance of the evidence that the evidence
would have been available when a lawful search occurred).

Finally, in *United States v. Souza*, 233 F.3d 1197 (10th Cir. 2000), the court applied the
inevitable discovery exception to the illegal search of a suspicious package. *Id.* at 1205–06.
Though a UPS employee assisted by police illegally opened the package, the inevitable
discovery exception applied because, before the illegal search, the investigating agent had alerted
his office that he was returning to apply for a warrant, the box was alerted to by a narcotics dog,
and was secured by police officers. *Id.*

All of the factors relied upon by these courts when applying the inevitable discovery
doctrine are demonstrated here. A magistrate judge would have issued a search warrant based on
Detective Son's draft affidavit. Hr'g Ex. 2. The affidavit included specific allegations of sexual
abuse and production of child pornography based on independent victim interviews that occurred
before Restitullo was taken into custody. *Id.* Additionally, the draft affidavit identified the
Defendant's bedroom as the place where the illegal acts took place and described specific items,
such as a silver camera and a computer, which the victims stated were used in the crimes. Hr'g
Tr. 30:1–7, 31:8–19; Hr'g Ex. 2.

Though the warrant process was in its early stages, the evidence shows that the items
seized would have been present when the warrant actually issued. *Cf. United States v. Stokes*,

733 F.3d 438, 446 (2d Cir. 2013) (declining to apply inevitable discovery where several plausible contingencies, "predicated on an assessment of the actions that might have been taken by third parties," might have prevented the discovery of physical evidence). On the evening of March 13, 2014, two officers had secured the Restitullo residence in anticipation of the issuance of a search warrant, Felix Restitullo was in custody, and his mother was waiting at the Special Victims Unit. Hr'g Tr. 81:5–9; ECF No. 23-1 Ex. B, at 2. Finally, after seizing evidence from Mr. Restitullo's bedroom, the police obtained a search warrant to access the information stored on the various hard drives they recovered. ECF No. 23-1 Ex. B, at 21 n.114.

Generally, the Court is reluctant to apply the inevitable discovery exception when the Government fails to obtain a search warrant and no exception to the warrant requirement exists. Here, however, the United States has demonstrated by a preponderance of the evidence that the illegally obtained evidence would have been inevitably discovered.

### CONCLUSION

The Court finds that Restitullo did not waive his *Miranda* rights and voluntarily give consent to a search of his home. As discussed, the Court also finds that the inevitable discovery exception applies in this case. It follows then that Defendant's motion to suppress is granted as to the statements he made to detectives and denied with regard to the evidence recovered from the search of his residence. An appropriate order follows.

DATE: *18 October 2016*

William H. Walls
Senior United States District Court Judge